IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEWIS WRIGHT, | : | CIVIL ACTION |
|     Petitioner, | : | |
| | : | |
| | : | |
| | : | |
| COMMONWEALTH OF PENNSYLVANIA, et al. | : | |
|     Respondents. | : | NO.  11-7466 |

## REPORT AND RECOMMENDATION

LINDA K. CARACAPPA
UNITED STATES MAGISTRATE JUDGE

       Now pending before this court is a petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254, by a petitioner currently incarcerated in the State Correctional Institution Coal Township, in Coal Township, Pennsylvania.  For the reasons which follow, it is recommended that the petition be DISMISSED.

I.      PROCEDURAL HISTORY

       On August 16, 2005, following a jury trial before the Honorable Rose Marie DeFino-Nastasi of the Philadelphia County Court of Common Pleas, petitioner was found guilty of attempted murder, aggravate assault, possessing an instrument of crime, possession with intent to deliver a controlled substance, and violation of the firearms act.  As set forth by the trial court, the following facts were established at petitioner's trial:

> On April 1, 2003, at approximately 9:15 A.M., Michael Hyrnko was
> driving his truck on Old York Road in Philadelphia.  His mother, [Louise]
> Hyrnko, was in the passenger seat.  As Mr. Hyrnko approached a stop sign
> at the intersection of Old York Road and Germantown Avenue, a tan car hit
> the rear of his truck.  Mr. Hyrnko got out and walked to the rear of his truck
> to check for damage.  At the same time, the driver of the tan car, later
> identified as [petitioner], got out of the tan car and had words with Mr.
> Hyrnko.  [Petitioner] started coming toward Mr. Hyrnko with his hands up

like he was ready to hit Mr. Hyrnko. Mr. Hyrnko hit [petitioner] and knocked him to the ground.

Mr. Hyrnko then walked back to his truck. As he was getting back into his truck, [petitioner] came up behind him, put a gun to Mr. Hyrnko's neck, said, "[W]hat now, pussy[?]", and pulled the trigger of the gun.

Mr. Hyrnko was taken to Temple University Hospital. He was at Temple for two (2) weeks before getting transferred to Jefferson Hospital. He was in Jefferson Hospital for two (2) months before getting transferred to Magee Rehabilitation. He was in Magee Rehabilitation for four (4) months. As a result of the shooting, Mr. Hyrnko is a quadriplegic. He is only able to move his head, neck and shoulders.

Mr. Joseph Farley and Ms. Andrea Yorro were standing on the corner of Old York Road and Ontario Street having a conversation. Mr. Farley, an eyewitness to the traffic accident and the shooting, placed a 911 call. Ms. Yorro, a crossing guard, saw the traffic accident and wrote down the license tag of the shooter's car. She did not see the shooting, but she heard it. The license plate number was EKF 9797, and she described the car as being a beige Chevrolet Malibu. She testified that there was only one (1) person in the car but she made no identification.

Mr. Farley and Ms. Yorro were both at East Detectives Division giving statements concerning the incident when they were taken to the Enterprise car lot at Delaware Ave[nue] and Spring Garden Street to make an identification of a car that was there. As Mr. Farley was telling the police that the car that was involved in the incident was there, Mr. Farley saw [petitioner] and told the police that the shooter was right there in front of them. Ms. Yorro identified the car as the shooter's car.

Mr. Louise Hyrnko gave a statement to the police at approximately 10:00A.M. on the day of the incident. She was later transferred to the Enterprise car lot on Delaware Avenue and Spring Garden Street where she identified [petitioner] as the person who shot her son.

On the date of the incident, Corporal James Keenan received a radio call reporting a man down because of a shooting. He received flash information to be on the lookout for a beige Chevy or Nissan Altima with license number EKF-9797 and for a light skinned black male in his later forties. He received information from police radio that the car was rented out of Enterprise Leasing. He called the corporate headquarters of Enterprise Leasing and found out that the car was leased to [petitioner]. At approximately 10:35 A.M., that same day, Enterprise Leasing contacted Corporal Keenan. Based on the information received, Corporal Keenan and Police Officers Drew Oldrati and [Christopher] Sarris went to the

2

>Enterprise car lot. When Corporal Keenan arrived at the Enterprise car lot at approximately 11:00 A.M., he saw [petitioner] and another man taking boxes of clothing out of a beige Chevy Malibu and putting the boxes of clothing into a blue Chevy Cavalier. Corporal Keenan and Police Officers Oldrati and Sarris stopped [petitioner] and the other man and took them in to custody.
>
>Detective Frank Green, assigned detective to the case, obtained a search warrant for the beige Chevy Malibu and the blue Chevy Cavalier. Detective Green and Sergeant Brosnan executed the search warrant on the cars at the police garage at approximately 9:35 P.M. From inside the Chevy Malibu, a brown paper bag was recovered that contained two gray vitamin jars with GNC labels. The jars contained 96 tinted packets of cocaine. Also recovered from that vehicle were samples of paint from the bumper and black bomber jacket.

(Trial Court Opinion, 8/25/06, at 9-11.)

On November 3, 2005, petitioner was sentenced to an aggregate term of twenty to forty years' incarceration.

Petitioner filed a direct appeal to the Superior Court. On June 15, 2007, the Superior Court affirmed petitioner's judgment of sentence. On May 28, 2008, the Pennsylvania Supreme Court denied petitioner's petition for allowance of appeal.

On December 15, 2008, petitioner filed a timely pro se petition under the Post Conviction Relief Act (PCRA) § 9541, et seq. Counsel was appointed to represent petitioner, and subsequently submitted a no-merit letter pursuant to Commonwealth v. Finely, 379 Pa. Super. 390, 550 A.2d 213 (1988) (en banc)[1], with a petition to withdraw. The PCRA court dismissed the PCRA petition without a hearing. On March 28, 2011, the Superior Court

---

[1] Pursuant to Commonwealth v. Finley, 550 A.2d 213 (Pa. Super. 1988), appointed counsel in a post conviction proceeding may be given leave to withdraw upon the submission of a "no-merit" letter that details the nature and extent of his review of the case, lists each issue the petitioner wished to have reviewed, and explains his assessment that the case lacks merit. The court must also conduct an independent review of the record and must agree with counsel that the petition is meritless before dismissing the petition.

affirmed the PCRA court dismissal of the petition. On November 1, 2011, the Pennsylvania Supreme Court denied petitioner's request for allocatur.

Petitioner filed the instant timely petition for Writ of Habeas Corpus on November 21, 2011. Petitioner supplemented the instant habeas petition on February 16, 2012. Petitioner claims:

> (1) Trial Court erred in denying petitioner's motion to suppress the identification evidence of Joseph Farley;
>
> (2) Trial Court erred in admitting evidence of the 911 telephone call, over petitioner's counsel's objection;
>
> (3) Trial Court erred in overruling petitioner's counsel's objection to the Commonwealth's reference, during closing argument, to petitioner's pre-arrest silence; and
>
> (4) Ineffective assistance of trial counsel for failing to investigate adequately the criminal record of defense witness James Dixon.

Respondents retort that petitioner is not entitled to federal habeas relief because petitioner's claims are without merit. We agree.

II.  STANDARD OF REVIEW

Petitioner's claims are subject to the following standard of review.

Under the current version of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), an application for Writ of Habeas Corpus from a state court judgment bears a significant burden. Section 104 of the AEDPA imparts a presumption of correctness to the state court's determination of factual issues - a presumption that petitioner can only rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (1994). The statute also grants significant deference to legal conclusions announced by the state court as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted with respect to any claim that was

4

>adjudicated on the merits in State court proceedings unless adjudication of the claim -
>
>(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court, in Williams v. Taylor, 529 U.S. 362, 404-05, 120 S. Ct. 1495 (2000), interpreted the standards established by the AEDPA regarding the deference to be accorded state court legal decisions, and more clearly defined the two-part analysis set forth in the statute.  Under the first part of the review, the federal habeas court must determine whether the state court decision was "contrary to" the "clearly established federal law, as determined by the Supreme Court of the United States."  As defined by Justice O'Connor, writing for the majority of the Court on this issue, a state court decision can be contrary to Supreme Court precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to that reached by [the Supreme Court]."  Id.  Justice O'Connor explained, however, that this "contrary to" clause does not encompass the run-of-the-mill state court decisions "applying the correct legal rule from Supreme Court cases to the facts of the prisoner's case."  Id. at 406.

To reach such "run-of-the-mill" cases, the Court turned to an interpretation of the "unreasonable application" clause of § 2254(d)(1).  It found that a state court decision can involve an unreasonable application of Supreme Court precedent: (1) "if the state court identifies

5

the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407-08. The Court specified, however, that under this clause, "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 410.

### III. DISCUSSION OF MERITS

Petitioner's claim will now be addressed on the merits.

#### A. The Trial Court Erred in Allowing Eyewitness Identification into Evidence

Petitioner argues that eyewitness identification of petitioner by Commonwealth witness, Joseph Farley, was impermissibly suggestive and the trial court erred in denying petitioner's motion to suppress said identification. Petitioner raised this claim on direct appeal before the Superior Court. The Superior Court denied the claim as meritless. (Superior Court Direct Appeal Opinion, 6/15/07, at 5-8). We agree and dismiss the claim.

The trial court made the following findings of fact regarding Joseph Farley's identification:

> Mr. Farley called 911 and gave a description of the shooter. He was later interviewed by the detectives assigned to the case. While he was being interviewed, the detectives told Mr. Farley that the police were in pursuit of the shooter. The detectives took Mr. Farley to the Enterprise car lot at Spring Garden St. and Delaware Ave. There, Mr. Farley observed that there was one car that was apart from other cars. The Detectives asked Mr. Farley if he saw the car that was involved in the incident. Mr. Farley indicated that the car that was involved in the incident was there on the lot. As soon as the police officers pulled into the lot, Mr. Farley looked over and saw a male having a verbal altercation with police officers. Aside

> from [petitioner], there was one (1) other male present who was not in police uniform. Mr. Farley told the detectives, "that's him, that's the shooter", as he identified [petitioner].
> Mr. Farley remembered the description that he gave of the shooter: 5 feet, 11 inches, 160 to 200 pounds, medium build. He remembered that he gave the 911 operator a description of what the shooter was wearing, but did not remember what that was.
> Mr. Farley testified that he remembered the shooter's face as a result of observing it when [petitioner] walked back to his car after the altercation with Hyrnko following the traffic accident and observing it again when [petitioner] walked back to his car after [petitioner] had shot Hyrnko. (Notes of Testimony, August 8, 2005, Pgs. 184-187).
> …Mr. Farley was standing 40 feet away on a bright, sunny day when he saw this incident… The description he gave of what the shooter was wearing was that the shooter was wearing dark blue or black pants, black jacket and a gray and black hat.

(Trial Court Opinion, 8/25/06, at 3-4.)

Petitioner argues that Mr. Farley's identification was unreliable and unduly suggestive. Petitioner argues that the identification was impermissibly suggestive because the Mr. Farley knew that the police received a call that police had petitioner in custody, police asked Mr. Farley if the vehicle at Enterprise Leasing was the vehicle Mr. Farley saw at the shooting, and petitioner was standing there with police. Petitioner also argues that the identification was not reliable because Mr. Farley's description of petitioner to police immediately after the shooting was lacking any distinct physical features, other than height, weight and complexion, Mr. Farley only saw the shooter's face for a couple of seconds and did not give his undivided attention to the circumstances unfolding, and Mr. Farley had an open criminal case against him, and thus it should be inferred that Mr. Farley hoped to be rewarded for his testimony with leniency for his own criminal prosecution.

Under the Pennsylvania standard for assessing the reliability of an identification, "the central inquiry is whether, under the totality of the circumstances, the identification was reliable." McElrath v. Commonwealth, 405 Pa.Super. 431, 592 A.2d 740, 742

(Pa.Super.Ct.1991).  The court must decide whether the challenged identification is reliable enough on its own in order to warrant admission, despite suggestive procedures.  Commonwealth v. Thompkins, 311 Pa.Super. 357, 457 A.2d 925, 928 (Pa.Super.Ct.1983).  "Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors." McElrath, 592 A.2d at 742.  The court will consider the following factors in order to determine whether or not to admit identification evidence: "the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  Id. at 743.   These factors are in line with Supreme Court precedent in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) and Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140(1977).  The Supreme Court has held that, even if an identification procedure is unnecessarily suggestive, admission of the suggestive identification does not violate due process so long as the identification possesses sufficient aspects of reliability,  Brathwaite, 432 U.S. 98, for reliability is the "linchpin in determining the admissibility of identification testimony."  Id. at 114;  *see also*  United States v. Wise, 515 F.3d 207, 215 (3d Cir.2008). The central question is " 'whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Brathwaite, 432 U.S. at 106 (quoting  Biggers, 409 U.S. at 199); *see also* United States v. Maloney, 513 F.3d 350, 355 (3d Cir.2008).

       Following the suppression hearing, the trial court held that the identification was not impermissibly suggestive, and that in any event, there were reliable, independent grounds for Mr. Farley's identification.  The trial court noted even assuming arguendo that the identification

was suggestive…. Mr. Farley had sufficient opportunity to observe petitioner by seeing petitioner's face two separate times, standing approximately forty feet from the shooting on a bright and sunny morning with an unobstructed view. The trial court further noted that Mr. Farley provided and accurate description to police and within two hours of the incident, immediately upon seeing petitioner exclaimed, "that's him". (Trial Court Opinion, 8/25/06, at 7-8).

The Superior Court reviewed the trial court's decision and upheld it. The Superior Court explained that Mr. Farley had "independent opportunity to view [petitioner's] face and actions at the scene of the shooting from a distance of forty feet, for several seconds on each of two occasions, in good lighting, and without obstruction,", promptly relayed a description of the events to the police in a 911 call, and only two hours after the shooting "spontaneously identified [petitioner] as the shooter." (Superior Court Opinion, 6/15/07, at 10).

The Superior Courts' determination that Mr. Farley's identification was not impermissibly suggestive was not contrary to or an unreasonable application of Supreme Court precedent. Nor was the Superior Courts' ruling that the identification possessed sufficient aspect of reliability contrary to or an unreasonable application of Biggers. *See* Biggers, 409 U.S. at 199. As such, we must dismiss petitioner's habeas petition as to this claim.

B.  Trial Court Erred in Admitting the 911 Telephone Call Into Evidence

Petitioner next argues that the trial court's decision to admit into evidence the transcript of the 911 telephone call, over petitioner's counsel's objection, violated petitioner's constitutional right to confront witnesses against him. Petitioner claims that the admission of the 911 telephone call, in which unknown individuals at the scene of the shooting answered various questions from a police operator, and provided the operator with petitioner's license plate

number, was in violation of petitioner's Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2004). Petitioner asserts that the 911 telephone call was testimonial in nature.

The Superior Court reviewed this claim on direct appeal and dismissed it as meritless. Petitioner's defense during trial was that another occupant of petitioner's vehicle was the shooter. The Superior Court explained that in support of that defense, petitioner relied on a computer generated report to the police that several males were involved in the shooting. The Commonwealth then offered the 911 telephone call to show that the information of several males in petitioner's vehicle was not given to the 911 police dispatcher and was mis-communicated to the police. The Superior Court explained that the trial court allowed the entire tape as non-hearsay because it "was not offered for the truth of the matter asserted, but to prove that the statement of 'several males' being in the shooter's vehicle was not made by any caller." (Trial Court Opinion, 8/25/06, at 15.)

The Confrontation Clause provides a criminal defendant with the right "to be confronted with the witnesses against him." U.S. Const. Amend VI. The Supreme Court has recognized that the right of an accused to confront and cross-examine witnesses is essential to due process. *See* Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Court held that the Confrontation Clause bars the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53–54 (emphasis added). However, the Supreme Court has held that, a 911 call is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance. Davis v.

Washington, 547 U.S. 813, 827, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Therefore, statements describing an ongoing emergency, recorded during the course of a 911 call are generally not considered testimonial. Id. The non-testimonial statements in Davis can be distinguished from the testimonial statements in Crawford in that the statements were made as the event was actually happening, not after the fact; that there was an ongoing emergency and the elicited statements were necessary to resolve that emergency; and that the statements were not formal. Michigan v. Bryant, ––– U.S. ––––, ––––, 131 S.Ct. 1143, 1154, 179 L.Ed.2d 93 (2011).

The Superior Court applied Davis and determined that the license plate information from the anonymous male caller was non-testimonial; therefore, the trial court did not err in admitting the 911 tape. The Superior Court explained that:

> First, the challenged statements were given during an ongoing emergency. Within the immediate timeframe of the shooting, the anonymous male called 911 and reported the shooting. Second, the objective intent of the caller was to provide the operator with, inter alia, a description and license plate number of the shooter's car. The objective intent of the operator was to obtain sufficient information about the shooting to assist the police in meeting the emergency. Finally, the caller's "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." Davis, 126 S.Ct. at 2276-77.

(Superior Court Opinion, 6/15/07, at 14-15.)

This court agrees that the 911 call was made immediately following the shooting and was for the purpose of reporting the shooting. The caller was relaying information about petitioner's vehicle and license plate, and the operator's questions were to assist the police to resolve the emergency. The Superior Courts' application of Davis was not contrary to or an unreasonable application of Supreme Court precedent. Thus, petitioner's second claim must be dismissed as meritless.

## C. The Trial Court Erred in Overruling Defense Counsel's Objection to Prosecutor's Closing Argument Statements

Petitioner next takes issue with the trial court's treatment of remarks made by the prosecutor during closing arguments. Petitioner argues that during closing arguments, the prosecutor improperly referred to petitioner's pre-arrest silence in violation of petitioner's Fifth Amendment right to remain silent, and while the trial court sustained defense counsel's objections to the prosecutor's remarks, the trial court erred in denying defense counsel's motion for a mistrial based on said remarks. Petitioner raised this claim on direct appeal and the Superior Court denied it on the merits.

The remarks petitioner takes issue with were made during closing arguments by the prosecutor. The prosecutor argued: "if somebody else in that car had done this shooting,… why wasn't [petitioner] on 911, calling 911? Calling the police and saying look, somebody there's a shooting here, just to even get the victim some help, even if you don't want to say who you are. Or call the police and say look, my car might be identified in a shooting, I had nothing to do with it," N.T., 8/15/03, at 152. Defense counsel objected and the trial court sustained the objection but then denied defense counsel's motion for a mistrial.

The Superior Court adopted the reasoning of the trial court in denying petitioner's claim on direct appeal. The trial court explained that the prosecutor's comments were made in response to the defense counsel's closing argument, that another passenger in petitioner's car was the real shooter. The trial court noted that during closing arguments, defense counsel made at least three references to an unidentified shooter, who was a passenger in petitioner's car. The trial court ruled that the prosecutor's comments were in fair response to the defense argumentation. The trial court explained that the United States Supreme Court has found that a defendant's silence may bear relevance to, and be admissible to establish other issues arising in a

12

criminal proceeding.  United States v. Robinson, 485 U.S. 25 (1988).  (Trial Court Opinion, 8/25/06, at 23).  In adoption of the trial court's reasoning the Superior Court explained, that the prosecutor's referral to petitioner's failure to assist the shooting victim by calling the police was in response to petitioner's defense that there was another shooter, and supported the prosecutor's position that petitioner acted alone in shooting the victim.  Thus, the Superior Court found that the prosecutor's comments were not improper.  (Superior Court Opinion, 6/15/07, at 19-21).

Additionally, prosecutorial misconduct constitutes a constitutional violation only when the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); accord Moore v. Morton, 255 F.3d 95, 105 (3d Cir.2001). To violate due process, prosecutorial misconduct must "constitute[ ] a 'failure to observe ... fundamental fairness essential to the very concept of justice.' " Moore, 255 F.3d at 105 (quoting Donnelly, 416 U.S. at 643). The prosecutor's comments must be viewed in the context of the entire trial. Walker v. Palakovich, 280 F. App'x 212, 216 (3d Cir.2008). Prosecutors are given great latitude, especially during closing arguments, to ask the jury to draw inferences based on the evidence presented at trial. Id. The appropriate inquiry when reviewing comments made during a prosecutor's closing is whether such remarks, in the context of the entire trial, were sufficiently prejudicial as to violate the defendant's due process rights. Id. Even a prosecutor's statement that warrants criticism does not rise to the high threshold required for unconstitutional misconduct unless there is a strong likelihood the jury's decision was influenced by the improper argument. Id. at 182. Several factors should be examined: the context within which the prosecutor's misconduct occurred; whether the trial court issued curative instructions after the prosecutor's misconduct; and whether the case against the defendant was strong. *See* Darden v. Wainwright, 477 U.S. 168, 182 (1986);

Moore, 255 F.3d at 107.

The prosecutor's comments were brief and, as explained by the Superior Court, in response to petitioner's defense theory. The prosecutor did not elicit testimony in regards to petitioner's failure to call the police or try to get the victim help, instead the prosecutor made the comments to support the theory that petitioner acted alone in the shooting and that there was not another shooter, who was a passenger in petitioner's car. Additionally, the trial judge sustained defense counsel's objection to the prosecutor's comments and instructed the jury not to construe the prosecutor's comments as evidence. Further, the victim and the victim's mother, who was in the car at the time of the shooting, identified petitioner as the shooter, as did the eyewitness, Joseph Farley. Petitioner has failed to prove that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. We cannot find that there is a strong likelihood the jury's decision was influenced by the improper argument. As such, petitioner's habeas petition must be dismissed as to this claim.

D.  Ineffective Assistance of Trial Counsel

Petitioner's final claim is that trial counsel was ineffective for failing to adequately investigate defense witness, James Dixon's, arrest record. Further, trial counsel was ineffective for not objecting to the prosecution's use of Dixon's arrest record to impeach Dixon. Petitioner argues that trial counsel was also ineffective for then questioning Dixon about his arrest history and stipulating with the prosecutor to Dixon's arrest record.

When reviewing claims of ineffective assistance of counsel, this court must view the totality of the evidence before the trial court and determine whether the petitioner has shown that the decision reached is reasonably likely to have been different, absent the alleged ineffectiveness of counsel. Strickland v. Washington, 466 U.S. 668, 695, 104 S. Ct. 2052, reh'g

denied, 467 U.S. 1267, 104 S. Ct. 3562 (1984). The Sixth Amendment to the United States Constitution recognizes the right of every criminal defendant to effective assistance of counsel. U.S. Const., Amend. VI. The Supreme Court has set forth a two-prong test - both parts of which must be satisfied - by which claims alleging counsel's ineffectiveness are adjudged. Id. at 668. First, the petitioner must demonstrate that his trial counsel's performance fell below an "objective standard of reasonableness." Id. The Supreme Court has explained that:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 76 S. Ct. 158, 163-64 (1955)).

A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment. Id. at 690. Then the reviewing court must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance." Id. Under Pennsylvania law, counsel is not ineffective for failing to raise baseless or frivolous issues. Commonwealth v. Wilson, 393 A.2d 1141, 1143 (Pa. 1978).

Second, the petitioner must demonstrate that his counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different." Id. at 694. A reviewing court need not determine whether counsel's performance was deficient before considering whether the petitioner suffered

any prejudice as a result of the alleged deficiency.  If it is easier to dispose of an ineffectiveness claim for lack of the requisite prejudice, that course should be followed.  Id. at 697.

The PCRA court reviewed this claim, and found it lacked merit.  The Superior Court affirmed that finding.

James Dixon was a defense witness, who testified that he witnessed the shooting, and that petitioner was not the shooter.  Mr. Dixon testified that he witnessed two men, other than petitioner, get out of petitioner's car, and one of those men shot the victim and ran away.  The PCRA court gave the following summary:

> On cross examination, the Assistant District Attorney (ADA), questioned Mr. Dixon regarding his date of birth and whether he had ever lived at a certain address in Norristown, Pennsylvania.  Mr. Dixon denied ever having been in Norristown.  The ADA then marked the criminal history of Mr. Dixon which had the date of birth he had given and an address in Norristown and showed it to Mr. Dixon without saying what it was.  Mr. Dixon denied that it was his "criminal record."  On redirect examination, in response to defense counsel questioning, Mr. Dixon claimed that he had never been arrested [NT, 8/15/05, at 77-80].  Mr. Dixon was instructed by the court to remain outside the courtrrom.  He left without being excused.  The ADA produced an arrest photo of Mr. Dixon which matched the FBI extract for Mr. Dixon at the address in Norristown.  Defense counsel stipulated that Mr. Dixon had been arrested before.  (NT, 8/15/05, at 83).

(PCRA Court Opinion, 6/25/10, at 6.)

After Mr. Dixon denied ever having been arrested, the ADA asked to publish Mr. Dixon's FBI extract to the jury to impeach his credibility.  Trial counsel then entered into a stipulation that Mr. Dixon had been arrested.  No further arrest information was given to the jury.

The PCRA court explained that trial counsel gave Mr. Dixon the opportunity to correct his falsehood, by saying "Sir, you're saying you've never been arrested in your life.  Is that correct?"  To which Mr. Dixon responded, "Never."  The PCRA court further explained that at side bar the court ruled that the FBI extract would be admitted into evidence because it went to

16

Mr. Dixon's credibility. In response to the ruling, trial counsel stipulated to the fact the Mr. Dixon had been arrested. The PCRA court found that the witness put trial counsel in the position of having to try and correct the credibility issue. The PCRA court ruled that trial counsel was not ineffective and in fact did his best to salvage the credibility of the witness. Trial counsel had no choice but to attempt to remedy the defense witness credibility issue. Stipulating to the fact that Mr. Dixon was arrested was the best way to keep the jury from seeing the facts of Mr. Dixon's arrest history. Petitioner has failed to prove that trial counsel's actions fell below an objective standard of reasonableness and that no competent lawyer would have acted in that manner. Additionally, as summarized above, there were multiple eyewitnesses, including the victim, who testified that petitioner was the shooter. Petitioner failed to prove that but for the testimony of Mr. Dixon's arrest record, the outcome of the trial would have been different. We cannot find that trial counsel was ineffective as to this claim. As such, we must dismiss the habeas petition as to this claim and in its entirety.

Therefore, we make the following:

RECOMMENDATION

AND NOW, this 28th day of January, 2014, IT IS RESPECTFULLY RECOMMENDED that the petition for Writ of Habeas Corpus be DISMISSED. It is also RECOMMENDED that a certificate of appealability not be granted.

The petitioner may file objections to this Report and Recommendation. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:

  /S LINDA K. CARACAPPA     
LINDA K. CARACAPPA  
UNITED STATES MAGISTRATE JUDGE