IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LEWIS WRIGHT                    :        CIVIL ACTION
                                :
        v.                      :
                                :
COMMONWEALTH OF                 :
PENNSYLVANIA, et al.            :        NO. 11-7466

ORDER

   AND NOW, this 8th day of May, 2014, upon consideration of petitioner Lewis

Wright's motion for habeas corpus pursuant to 28 U.S.C. § 2254[1] (docket entry # 1), Judge

Linda K. Caracappa's report and recommendation ("R&R") (docket entry # 19), petitioner's

objections thereto (docket entry # 21), and the Commonwealth's original response to petitioner's

habeas motion (docket entry # 12), which it incorporates in its "statement regarding objections"

(docket entry # 22); and the Court finding that:

   (a)  We are to conduct a de novo review of those portions of a magistrate

judge's R&R to which a party files objections, see, e.g., Sample v. Dieks, 885 F.2d 1099, 1106

n.3 (3d Cir. 1989) (citing Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1));

   (b)  Because Wright did not take issue with Judge Caracappa's recitation of

the background facts and procedural posture of the case, we will incorporate those here;

   (c)  As Judge Caracappa explained, Wright was found guilty of attempted

murder, aggravated assault, possessing an instrument of crime, possession with the intent to

deliver a controlled substance, and violating § 6106 of the Uniform Firearms Act on August 16,

---

[1] This case was originally assigned to Magistrate Judge L. Felipe Restrepo for a report and recommendation. Wright appears to have initiated the action pro se, and while the petition was pending before Judge Restrepo, Teri B. Himebaugh entered an appearance on Wright's behalf. Himebaugh drafted the objections to the R&R that we consider here.

2005 after a jury trial before Judge Rose Marie DeFino-Nastasi in the Philadelphia County Court

of Common Pleas, R&R at 1 (citing Trial Court Opinion, 8/25/06);

       (d)     The trial court summarized the facts as the parties established them at trial:

       On April 1, 2003, at approximately 9:15 A.M., Michael Hyrnko was driving his truck on Old York Road in Philadelphia. His mother, [Louise] Hyrnko, was in the passenger seat. As Mr. Hyrnko approached a stop sign at the intersection of Old York Road and Germantown Avenue, a tan car hit the rear of his truck. Mr. Hyrnko got out and walked to the rear of his truck to check for damage. At the same time, the driver of the tan car, later identified as [petitioner], got out of the tan car and had words with Mr. Hyrnko. [Petitioner] started coming toward Mr. Hyrnko with his hands up like he was ready to hit Mr. Hyrnko. Mr. Hyrnko hit [petitioner] and knocked him to the ground.

       Mr. Hyrnko then walked back to his truck. As he was getting back into his truck, [petitioner] came up behind him, put a gun to Mr. Hyrnko's neck, said, "[W]hat now, pussy[?]", and pulled the trigger of the gun.

       Mr. Hyrnko was taken to Temple University Hospital. He was at Temple for two (2) weeks before getting transferred to Jefferson Hospital. He was in Jefferson Hospital for two (2) months before getting transferred to Magee Rehabilitation. He was in Magee Rehabilitation for four (4) months. As a result of the shooting, Mr. Hyrnko is a quadriplegic. He is only able to move his head, neck and shoulders.

       Mr. Joseph Farley and Ms. Andrea Yorro were standing on the corner of Old York Road and Ontario Street having a conversation. Mr. Farley, an eyewitness to the traffic accident and the shooting, placed a 911 call. Ms. Yorro, a crossing guard, saw the traffic accident and wrote down the license tag of the shooter's car. She did not see the shooting, but she heard it. The license plate number was EKF 9797, and she described the car as being a beige Chevrolet Malibu. She testified that there was only one (1) person in the car but she made no identification.

       Mr. Farley and Ms. Yorro were both at East Detectives Division giving statements concerning the incident when they were taken to the Enterprise car lot at Delaware Ave[nue] and Spring Garden Street to make an identification of a car that was there. As Mr. Farley was telling the police that the car that was involved in the incident was there, Mr. Farley saw [petitioner] and told the

2

police that the shooter was right there in front of them. Ms. Yorro identified the car as the shooter's car.

Ms. Louise Hyrnko gave a statement to the police at approximately 10:00A.M. on the day of the incident. She was later transferred to the Enterprise car lot on Delaware Avenue and Spring Garden Street where she identified [petitioner] as the person who shot her son.

On the date of the incident, Corporal James Keenan received a radio call reporting a man down because of a shooting. He received flash information to be on the lookout for a beige Chevy or Nissan Altima with license number EKF-9797 and for a light skinned black male in his late forties. He received information from police radio that the car was rented out of Enterprise Leasing. He called the corporate headquarters of Enterprise Leasing and found out that the car was leased to [petitioner]. At approximately 10:35 A.M., that same day, Enterprise Leasing contacted Corporal Keenan. Based on the information received, Corporal Keenan and Police Officers Drew Oldrati and [Christopher] Sarris went to the Enterprise car lot. When Corporal Keenan arrived at the Enterprise car lot at approximately 11:00 A.M., he saw [petitioner] and another man taking boxes of clothing out of a beige Chevy Malibu and putting the boxes of clothing into a blue Chevy Cavalier. Corporal Keenan and Police Officers Oldrati and Sarris stopped [petitioner] and the other man and took them into custody.

Detective Frank Green, the assigned detective to the case, obtained a search warrant for the beige Chevy Malibu and the blue Chevy Cavalier.  Detective Green and Sergeant Brosnan executed the search warrant on the cars at the police garage at approximately 9:35 P.M. From inside the Chevy Malibu, a brown paper bag was recovered that contained two gray vitamin jars with GNC labels. The jars contained 96 color tinted packets of cocaine. Also recovered from that vehicle were samples of paint from the bumper and a black bomber jacket.

Trial Court Opinion, August 25, 2006, at 9-11;

(e)      The trial court sentenced Wright to an aggregate term of twenty to forty

years' incarceration on November 3, 2005, R&R at 3;

3

(f)      Wright filed a timely appeal, and on June 15, 2007, the Superior Court affirmed his sentence, id.;

(g)      On May 28, 2008, the Pennsylvania Supreme Court denied his petition for an allowance of appeal, id.;

(h)      Wright also filed a timely pro se petition under the Post Conviction Relief Act (PCRA) § 9541, et seq., and counsel was appointed to represent him, id.;

(i)      Wright's PCRA counsel submitted a "no-merit" letter pursuant to Commonwealth v. Finely, 550 A.2d 213 (Pa Super. Ct. 1988), asking to be dismissed from the case because he believed there were no issues warranting review, which the PCRA Court granted, and on March 28, 2011, the Superior Court affirmed the dismissal, id.;

(j)      On November 1, 2011, the Pennsylvania Supreme Court denied petitioner's request for allocator, id.;

(k)      Wright filed a petition for habeas corpus in this Court on November 21, 2011, and he supplemented it on February 16, 2012;

(l)      In his petition, Wright raises four claims, three concerning alleged errors of the trial court and one alleging ineffective assistance of counsel;

(m)     Judge Caracappa found that Wright's petition was timely filed and so warranted review on the merits, see R&R at 4;

(n)      The Commonwealth maintains that Wright fairly presented all these claims in state court, and so 28 U.S.C. § 2254(e) and (e) should guide our review;

4

(o)   Judge Caracappa agreed with respect to the first three claims and evaluated them under the deferential standard of review the Antiterrorism and Effective Death Penalty Act ("AEDPA") commands, recommending dismissal of all claims, id. at 18;

(p)   With regard to the fourth claim, Judge Caracappa conducted an independent Strickland analysis, an approach we depart from, as we discuss herein;

(q)   Wright objects to the findings as to each claim, so we will review each claim de novo;

(r)   Pursuant to § 2254(d), we may not grant habeas with regard to claims that were adjudicated on the merits in state court unless that adjudication:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(s)   As Justice O'Connor explained in Williams v. Taylor, 529 U.S. 362 (2000), a state court decision is contrary to clearly established federal law if either (1) "the state court applies a rule that contradicts the governing law set forth in our cases" because it is "diametrically different", "opposite in character", or "mutually opposed" to clearly established precedent, id. at 405-06, or if (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent", id. at 406;

(t)      Justice O'Connor explained that the "contrary to" prong does not encompass the "run-of-the-mill state-court" case, where the court has applied the correct legal rule from United States Supreme Court precedent to the facts of a petitioner's case, id.;

(u)      Instead, in such a case, we must look to the second prong to determine whether the state court decision involved an "unreasonable application" of United States Supreme Court precedent, id.;

(v)      A decision involves an unreasonable application of such precedent if "the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case" or if it "either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply", id. at 407;

(w)      Williams stressed that "an unreasonable application of federal law is different from an incorrect or erroneous application of federal law", id. at 412, and therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable", id. at 411;

(x)      A state court's determination is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision", Harrington v. Richter, -- U.S. --, 131 S. Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004));

(y)      With regard to the trial court's factual determinations, we are obliged to afford them a "presumption of correctness" that the petitioner can rebut only by "clear and convincing evidence", § 2254(e)(1);

6

(z)     Finally, before we can reach the merits of a claim in a § 2254 petition, the claim must have been exhausted in state court, see, e.g., § 2254(b)(1)(A);

(aa)    The exhaustion requirement affords state courts, as a matter of comity, a fair opportunity to pass on a petitioner's claims, see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 853 (1999); Baker v. Horn, 210 F. Supp. 2d 592, 625 (E.D. Pa. 2002) (Brody, J.);

(bb)    The exhaustion requirement is non-jurisdictional, see, e.g, Strickland v. Washington, 466 U.S. 668, 684 (1984), and the state may waive it, as the Eighth Circuit cogently explained, "as chief legal officer of the state, the attorney general is the appropriate person to assert, or to waive, the state's right first to determine a habeas corpus claim", Hampton v. Miller, 927 F.2d 429, 431 (8th Cir. 1991) (internal citations and alterations omitted);

(cc)    With those standards in mind, we begin with the claim that the trial court erred in denying petitioner's motion to suppress Joseph Farley's eyewitness identification;

(dd)    The Supreme Court examined the requirements the Due Process Clause of the Fourteenth Amendment imposes on admission of identification testimony in cases where the confrontation procedure is suggestive in Neil v. Biggers, 409 U.S. 188 (1972) and Manson v. Brathwaite, 432 U.S. 98 (1977);

(ee)    The Supreme Court held that the Due Process Clause does not require courts to exclude an identification solely because the confrontation procedure was suggestive; instead, courts are to consider the totality of the circumstances in determining the reliability of the identification and admit the evidence if "despite the suggestive aspect" of the confrontation, "the out-of-court identification possesses certain features of reliability", Brathwaite, 432 U.S. at 110;

(ff)    <u>Brathwaite</u> stressed that "reliability is the linchpin in determining the admissibility of identification testimony", <u>id.</u> at 114;

(gg)    In evaluating the totality of the circumstances, courts are to consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation", <u>Biggers</u>, 409 U.S. at 199-200;

(hh)    As the trial court recalled in its August 25, 2006 opinion,

Mr. Farley called 911 and gave a description of the shooter. He was later interviewed by the detectives assigned to the case. While he was being interviewed, the detectives told Mr. Farley that the police were in pursuit of the shooter. The detectives took Mr. Farley to the Enterprise car lot at Spring Garden St. and Delaware Ave. There, Mr. Farley observed that there was one car that was apart from other cars. The Detectives asked Mr. Farley if he saw the car that was involved in the incident. Mr. Farley indicated that the car that was involved in the incident was there on the lot.  As soon as the police officers pulled into the lot, Mr. Farley looked over and saw a male having a verbal altercation with police officers. Aside from [petitioner], there was one (1) other male present who was not in police uniform. Mr. Farley, told the detectives, "that's him, that's the shooter", as he identified [petitioner].

Mr. Farley remembered the description that he gave of the shooter: 5 feet, 11 inches, 160 to 200 pounds, medium build. He remembered that he gave the 911 operator a description of what the shooter was wearing, but did not remember what that was.

Mr. Farley testified that he remembered the shooter's face as a result of observing it when [petitioner] walked back to his car after the altercation with Hyrnko following the traffic accident and observing it again when [petitioner] walked back to his car after [petitioner] had shot Hyrnko.  (Notes of Testimony, August 8, 2005, Pgs. 184-187).

Based on these facts, the court made the following conclusions of law:

8

> ". . . Mr. Farley was standing 40 feet away on a bright, sunny day when he saw this incident… He gave a detailed description of the shooter to the police. The description he gave of the shooter was that he was about 5 foot, 11 inches in height, medium complexion, short, dark hair, and approximately 180 to 200 pounds. The description he gave of what the shooter was wearing was that the shooter was wearing dark blue or black pants, black jacket and a gray and black hat".
>
> "Within two hours of the incident, Mr. Farley is brought to the Enterprise car lot where he does expect to see the shooter's car and had information that the police were in pursuit of the shooter, so he may have expected to see the shooter. But, Mr. Farley indicated that before he was asked any questions regarding the identification of the shooter, upon entry into the car lot, he saw the Defendant standing with police officers and indicated, 'that's him', without being prompted in any way".

Trial Court Opinion, August 25, 2006, at 3-4 (quoting N.T., Aug. 8, 2005, at 188-89);

(ii)     The trial court concluded that "[b]ased on the circumstances of this particular case, there was not a suggestive identification", and "[e]ven if Mr. Farley was primed to make an identification, he certainly had an independent opportunity to observe the Defendant. He was fairly close to the event on a bright, sunny day", and "gave a fairly detailed description of the shooter", id. at 5;

(jj)     According to the trial court, "[b]ased on the distance, the lighting and the description that he gave immediately after the incident; there was an independent opportunity to observe", id.;

(kk)     Wright raised this claim on direct appeal, and the Superior Court upheld the trial court's decision, R&R at 9, finding that "in consideration of the totality of the circumstances, [the challenged identification evidence] was reliable. There were no special elements of unfairness present that would have made Mr. Farley's identification so suggestive as

9

to give rise to an irreparable likelihood of misidentification", Superior Court Opinion, June 15, 2007, at 11;

(ll)     Judge Caracappa found that the Superior Court's determination that "Mr. Farley's identification was not impermissibly suggestive was not contrary to or an unreasonable application of Supreme Court precedent", nor was the appellate court's finding that "the identification possessed sufficient aspect[s] of reliability contrary to or an unreasonable application of" Neil v. Biggers, 409 U.S. 188 (1972);

(mm)    Wright objects to Judge Caracappa's "general reliance on the reliability of eyewitness identification", arguing that courts have found eyewitnesses to be generally unreliable, Pet. Obj. at ¶ 1(a);

(nn)    Though he does not say so explicitly, Wright objects to Judge Caracappa's findings with regard to both legal conclusions and the factual findings;

(oo)    With regard to the factual findings, Wright argues that "Farley's degree of attention was significantly limited" because "[h]e only observed the shooter's face from 40 feet away for 'a couple of seconds' and he did not 'give his undivided attention' to the shooter/situation", id. at ¶ 1(d);

(pp)    He further argues that

> Farley's description to police of the shooter lacked any description of the shooter's facial features.  Notably, Petitioner wore at the time a goatee.  This is a very distinctive facial feature that would have been immediately discernable.  The very general description Farley gave of the shooter's height, weight and complexion could have fit a significant portion of the male population of Philadelphia.  As could the clothing the suspect wore.

Id. at ¶ 1(d);

10

(qq)     Wright also challenges Judge Caracappa's conclusions regarding the state courts' legal conclusions, arguing that "when police had told [Farley] prior to going to the show up that they had apprehended the suspect" and they "brought Farley to the 'show up' at the rental car agency, [Farley] saw Petitioner standing in the midst of the crime scene tape <u>wearing handcuffs</u> and in close proximity to the beige Chevy Malibu", and so "[o]f course Farley exclaimed 'that's him'", <u>id.</u> at ¶ 1(e); this exclamation, according to Wright "was only a confirmation of what the police had told [him]" and so it "cannot therefore be used as a basis for finding Farley's identification reliable and admissible", <u>id.</u>;

(rr)     Wright objects that Judge Caracappa "did not specifically address why the state court determin[ed] that Farley's identification was not unduly suggestive" and instead "concentrated her argument on whether there were sufficient factors establishing the reliability of the identification", <u>id.</u> at ¶ 1(b);

(ss)     Wright contends, "This Court cannot . . . find, based on the totality of the circumstances, that the Farley identification possessed 'sufficient aspects of reliability'', <u>id.</u> at ¶ 1(e);

(tt)     Wright's argument that the show-up was impermissibly suggestive is unavailing in light of our posture on <u>habeas</u> review;

(uu)     First, Wright's general objection to the reliability of eyewitness testimony is irrelevant to our determination when Supreme Court precedent unambiguously allows the admission of such testimony;

(vv)     With regard to the trial court's factual determinations as to Farley's ability to see Wright while the shooting was taking place, Wright's account -- in which he agrees that

11

Farley observed Wright from about forty feet away during the shooting -- does not begin to rebut by clear and convincing evidence the presumption of correctness we must give to a trial court's factual determinations;

(ww)   Wright's allegation that Judge Caracappa "did not specifically address why the state court determin[ed] that Farley's identification was not unduly suggestive" is simply untrue -- Judge Caracappa rehearsed the findings of fact the trial court made in its totality of the circumstances analysis;

(xx)   Judge Caracappa wrote that "[t]he trial court noted even assuming arguendo that the identification was suggestive", Farley "had sufficient opportunity to observe petitioner by seeing petitioner's face two separate times, standing approximately forty feet from the shooting on a bright and sunny morning with an unobstructed view", he "provided an[] accurate description to police and within two hours of the incident, immediately upon seeing petitioner exclaimed, 'that's him'", R&R at 8-9 (citing Trial Court Opinion, August 25, 2006);

(yy)   The thrust of Wright's objection is that the trial court reached the wrong result as to reliability in evaluating the totality of the circumstances, and that the Superior Court was wrong to uphold the finding -- Wright argues, for example, that the identification's reliability is undermined by the witness's failure to mention Wright's goatee in the description he gave to the police and by the generality of that description, Pet. Obj. at ¶ 1(d);

(zz)   But we cannot say that Judge DeFino-Nastasi's conclusion or the Superior Court's decision to affirm the admission, where both courts considered several of the factors the Supreme Court set out in <u>Neil</u> -- were contrary to or an unreasonable application of clearly established federal law;

12

(aaa)   We will therefore overrule Wright's objections with regard to the first claim;

(bbb)   We turn to Wright's second claim, that the trial court erred in admitting the tape from the 911 telephone call;

(ccc)   Wright argues that the trial court violated his rights under the Confrontation Clause by admitting a tape from the 911 telephone call, during which unidentified people at the scene of the shooting spoke to police officers and provided a driver's license number;

(ddd)   The trial court admitted the tape over the defendant's hearsay objection, finding that the prosecution was not entering it for the truth of the matter asserted, Trial Court Opinion, August 25, 2006, at 15;

(eee)   As Judge DeFino-Nastasi reasoned, "the defense presented in this case was that a passenger in the Defendant's vehicle was the shooter and not the Defendant", and defense counsel questioned Corporal James Keenan, a Philadelphia police officer, about "a written statement given by Corporal Keenan to the assigned detective wherein it was recorded that Corporal Keenan stated that the radio flash regarding the incident in question was that there were, 'several other males' in the shooter's vehicle", id.;

(fff)   The trial court explained that "[t]he Commonwealth argued . . . that no caller on the 911 tape stated that there was anyone other than the Defendant in the shooter's vehicle" and that in writing his statement, Corporal Keenan had relied on "a summary created by the police dispatcher and that the dispatcher was mistaken when she relayed other males as being in the shooter's vehicle", id.;

13

(ggg)   Thus, Judge DeFino-Nastasi explained that she admitted the tape not for the truth of the statements it contained but in order to show "that the statement of 'several males' being in the shooter's vehicle was not made by any caller", id.;

(hhh)   The Superior Court found that the admission did not violate Wright's Sixth Amendment right to confront witnesses against him because the statements on the tape were non-testimonial and so not subject to the Confrontation Clause, see Superior Court Opinion June 15, 2007 at 14-15;

(iii)   In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court explained that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination", id. at 54;

(jjj)   Crawford explained that "[v]arious formulations of this core class of 'testimonial' statements exist", including, for example, "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions", id. at 51-52 (quoting White v. Illinois, 502 U.S. 346, 365 (1992));

(kkk)   In Davis v. Washington, 547 U.S. 813 (2006), the Supreme Court considered whether statements made to a 911 operator were testimonial and thus subject to the Confrontation Clause;

(lll)   The Supreme Court held that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency", Davis, 547 U.S. at 822;

14

(mmm)   Under <u>Davis</u>, statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution", <u>id.</u>;

(nnn)   In reviewing Wright's appeal here, the Superior Court found that the 911 call was non-testimonial under <u>Davis</u> and therefore fell outside of the scope of the Confrontation Clause:

> Applying the <u>Davis</u> test to the case at hand, we conclude that the license plate information from the anonymous male caller was nontestimonial; therefore, the trial court did not err in admitting the 911 tape.  First, the challenged statements were given during an ongoing emergency.  Within the immediate timeframe of the shooting, the anonymous male called 911 and reported the shooting.  Second, the objective intent of the caller was to provide the operator with, <u>inter alia</u>, a description and license plate number of the shooter's car.  The objective intent of the operator was to obtain sufficient information about the shooting to assist the police in meeting the emergency.  Finally, the caller's 'frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.'  Because the information was given in the course of a police interrogation under circumstances objectively indicating that the primary purpose of the interrogation was to enable police assistance to meet an ongoing emergency, admission of the 911 tape did not violate Appellant's Sixth Amendment right to confront witnesses.

Superior Court Opinion, June 15, 2007, at 14-15 (quoting <u>Davis</u>, 547 U.S. at 827);

(ooo)   The Superior Court thus rejected Wright's argument that admitting the tape violated his Sixth Amendment right to confrontation, <u>see</u> Superior Court Opinion, June 15, 2007, at 14-15;

(ppp)   Judge Caracappa found that this application of <u>Davis</u> was "not contrary to or an unreasonable application of Supreme Court precedent" and therefore found that she could not grant <u>habeas</u> relief on this ground;

(qqq)   Wright objects generally to the finding that the statements were not testimonial and thus the admission did not violate his confrontation right, and specifically, he argues that "[t]he clear objective intent behind the callers' descriptions of the suspect contained in the 911 calls was to identify the suspect and <u>not</u> to call additional police to the location or to give them information as to the location [or] the nature of the crime", Pet. Obj. at ¶ 2(b) (emphasis in original);

(rrr)   Wright's objection thus appears to be that the Superior Court's determination that the statement was non-testimonial was unreasonable in light of the facts before the state court;

(sss)   We disagree -- the Superior Court's conclusions that "the objective intent of the caller was to provide the operator with, <u>inter alia</u>, a description and license plate number of the shooter's car" and that "[t]he objective intent of the operator was to obtain sufficient information about the shooting to assist the police in meeting the emergency" are not unreasonable in light of the transcript of the 911 tapes the defense prepared, attached to the Trial Court's August 25, 2006 Opinion;

(ttt)   We agree with Judge Caracappa that the Superior Court's application of <u>Davis</u> in this case was neither contrary to nor an unreasonable application of clearly established federal law;

16

(uuu)   We next consider Wright's third claim, that the trial court erred in

overruling defense counsel's objection to statements the prosecutor made during his closing;

(vvv)   During her closing, the prosecutor said,

If somebody else in that car had done this shooting, ladies and
gentlemen, why wasn't he on 911, calling 911?  Calling the police
and saying look, somebody, there's a shooting here, just to even
get the victim some help, even if you don't want to say who you
are.  Or call the police and say look, my car might be identified in
a shooting, I had nothing to do with it.

N.T. August 15, 2005, at 152:2-10;

(www) Defense counsel objected to the statement, and the trial judge sustained the

objection, id. at 152:11-12;

(xxx)   Defense counsel then moved for a mistrial on the ground that "there was

an adverse comment on the defendant's right to remain silent", id. at 152:18-21, which the trial

judge denied;

(yyy)   Wright raised his objection in the Superior Court, and the Superior Court

affirmed the trial court and adopted the reasoning the trial court set forth in its opinion, i.e., that

the statement concerning pre-arrest silence was "in direct response to defense counsel's closing

arguments that a passenger in [Appellant's] car was the real shooter", Superior Court Opinion,

June 15, 2007, at 20;

(zzz)   The Superior Court quoted the trial court's reliance on United States v.

Robinson, 485 U.S. 25 (1988) for the proposition that "there is no Fifth Amendment proscription

precluding the raising [of] silence in fair response to defense argumentation" id., and found that

"[t]he ADA's argument was fair response to defense counsel's argument", id.;

17

(aaaa)  In <u>Robinson</u>, defense counsel argued during his closing that "the Government had not allowed [the defendant] to explain his side of the story", <u>id.</u> at 26, and the Government responded during its closing that the defendant "could have taken the stand and explained it to you", <u>id.</u>;

(bbbb) The Supreme Court found that there was no Fifth Amendment violation, for while "the privilege against compulsory self-incrimination is violated" if "the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence," there is no Fifth Amendment violation if a "prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel", <u>id.</u> at 32;

(cccc)  Judge Caracappa did not make a recommendation as to whether the Superior Court's application of <u>Robinson</u> was contrary to or an unreasonable application of federal law, instead applying the prosecutorial misconduct analysis the Supreme Court set forth in <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974), and finding that Wright had failed to show that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process", <u>id.</u> at 643, and so any prosecutorial misconduct that occurred did not rise to the level of a constitutional violation under <u>Donnelly</u>;

(dddd)  In the discussion at side-bar that followed defense counsel's objection, the prosecutor argued that the reference was permissible because it concerned pre-arrest rather than post-arrest silence, <u>see</u> N.T. at 152:22-25, and the Superior Court in its opinion "add[ed] to the trial court's analysis that . . . [Wright] did not affirmatively assert his right to remain silent in response to police inquiry"; instead, "[t]he pre-arrest silence to which the prosecutor referred was

[Wright]'s failure to assist the shooting victim or the police if, as Appellant claimed, someone else had been the shooter", Superior Court Opinion June 15, 2007;

       (eeee)  In <u>Jenkins v. Anderson</u>, 447 U.S. 231 (1980), Jenkins stabbed and killed someone, and the police did not apprehend him until he turned himself in about two weeks later;

       (ffff)    Jenkins testified at trial that he had acted defensively, and the prosecutor attempted to impeach his credibility, during both cross-examination and closing arguments, "by suggesting that the petitioner would have spoken out if he had killed in self-defense", <u>id.</u> at 235;

       (gggg) On collateral review, Jenkins argued that this reference violated his Fifth or Fourteenth Amendment rights against self-incrimination, and the Supreme Court held that impeachment by use of pre-arrest silence does not violate these rights, <u>see</u> <u>id.</u> at 240;

       (hhhh) In a concurring opinion, Justice Stevens wrote that "the privilege against compulsory self-incrimination is simply irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak", <u>id.</u> at 241 (Stevens, J., concurring);

       (iiii)    Justice Stevens reasoned that

> The fact that a citizen has a constitutional right to remain silent
> when he is questioned has no bearing on the probative significance
> of his silence before he has any contact with the police.  We need
> not hold that every citizen has a duty to report every infraction of
> law that he witnesses in order to justify the drawing of a reasonable
> inference from silence in a situation in which the ordinary citizen
> would normally speak out.  When a citizen is under no official
> compulsion whatever, either to speak or to remain silent, I see no
> reason why his voluntary decision to do one or the other should
> raise any issue under the Fifth Amendment.

<u>Id.</u> at 243-44;

19

(jjjj)     Though in <u>Jenkins</u> the defendant took the stand -- while here Wright did not testify -- that difference has not been dispositive in the recent application of Justice Stevens's concurrence in <u>Jenkins</u>;

(kkkk) Last year, in <u>Salinas v. Texas</u>, -- U.S. --, 133 S. Ct. 2174 (2013), the Supreme Court found that there was no Fifth Amendment violation when the prosecution told the jury that during pre-arrest questioning at the police station, the defendant had remained silent in response to one of the officers' questions -- the prosecutor told the jury "that '[a]n innocent person' would have said, 'What are you talking about?  I didn't do that.  I wasn't there.'  But Salinas, the prosecutor said, 'didn't respond that way.'  Rather, 'he wouldn't answer that question'", <u>id.</u> at 2185 (quoting <u>Salinas v. State</u>, 368 S.W. 3d 550, 556 (Tex. Ct. App. 2011) (further internal quotations omitted));

(llll)     Salinas did not testify at trial, <u>id.</u> at 2178, and the Supreme Court found that the Fifth Amendment did not bar the prosecutor's line of argument because Salinas had not "expressly invoke[d] the privilege against self-incrimination in response to the officer's question" at the station, <u>id.</u>;

(mmmm) Justice Breyer dissented in <u>Salinas</u>, and in doing so he distinguished that case from <u>Jenkins</u> because in <u>Jenkins</u>, where the pre-arrest silence occurred before the defendant had any contact with the police, "no one had any reason to connect silence to the Fifth Amendment";

(nnnn) In making this distinction, Justice Breyer approvingly cited Justice Stevens's assertion that "'the privilege against compulsory self-incrimination is simply

irrelevant' in such circumstances", <u>id.</u> at 2188 (Breyer, J., dissenting) (quoting <u>Jenkins</u>, 447 U.S. at 241 (Stevens, J., concurring));

(oooo)  Here, the trial court found, and the Superior Court affirmed, that the prosecutor's comment about Wright's failure to call the police was a response to Wright's defense that someone else in the car had committed the shooting;

(pppp)  Wright objects that the prosecutor's argument was not responsive to the defense theory -- that it "had <u>nothing</u> whatsoever to do with the argument made by the defense that an unidentified passenger in the car was the shooter", Pet. Obj. at ¶ 3(a);

(qqqq)    Though the prosecutor's response here was not as direct as was the response in <u>Robinson</u>, reasonable jurists could find that it was responsive, and so we find that the trial court and Superior Court's determination that it fell under <u>Robinson</u>'s ambit was not "contrary to or an unreasonable application of clearly established Federal law";

(rrrr)  Our conclusion is bolstered by the fact that the silence at issue took place before Wright had any contact with the police, and so the state courts' determinations were not unreasonable in light of <u>Jenkins</u> and <u>Salinas</u>;

(ssss)   Finally, we turn to Wright's claim of ineffective assistance of trial counsel;

(tttt)    Wright argues that trial counsel was ineffective for failing adequately to investigate the arrest record of James Dixon, a defense witness;

(uuuu)  In the PCRA court, Wright raised the claim that "trial counsel elicited testimony that the main defense eyewitness had been arrested, and thereafter failed to object to

the prosecution's use of that arrest to impeach the witness' character and veracity", PCRA

Opinion, June 25. 2010, at 7;

       (vvvv)    The well-known standard established in <u>Strickland v. Washington</u>, 466

U.S. 668, 690-92 (1984) governs ineffectiveness claims;

       (wwww)  According to that standard, a petitioner must establish <u>both</u> that (1)

counsel's performance was deficient, <u>i.e.</u>, unreasonable under prevailing professional standards,

and (2) the deficient performance prejudiced the defense;

       (xxxx)    Under the performance prong, "[j]udicial scrutiny . . . is highly

deferential," and courts "must indulge a strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance", <u>id.</u> at 688-89;

       (yyyy)    Under the prejudice prong, a petitioner "need not show that counsel's

deficient performance 'more likely than not altered the outcome of the case' -- rather, he must

show only 'a probability sufficient to undermine confidence in the outcome.'  This standard is

'not a stringent one'", <u>Jacobs v. Horn</u>, 395 F.3d 92, 105 (3d Cir. 2005) (quoting <u>Strickland</u>, 466

U.S. at 694 and <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir. 2001));

       (zzzz)    As Judge DeFino-Nastasi explained in the PCRA opinion,

> The defense called Mr. Jimmie Dixon.  Mr. Dixon testified that he was in the area at the time of the incident . . . He saw the Complainant get out of a truck and walk back toward the car the Defendant was driving.  He saw the Complainant reach into his pocket and hit the Defendant knocking him to the ground.  He heard the Complainant say, "I deal with niggers like you every day, you're lucky I didn't shoot your ass."  He then saw the Complainant walk back to his vehicle.  Mr. Dixon further testified that he saw two males exit the car the Defendant was driving and chase the Complainant.  He heard one of the males ask the other male to toss him something.  That male continued to run after the

       Complainant while the other returned to the car.  The Complainant was getting back into his truck.  He heard a gun shot.  He saw the Defendant get back into the car.  He saw the shooter walk towards a hospital that was located in the area. . . .

           Mr. Dixon testified that he had never given a statement to police and had never testified before in the case.  Mr. Dixon testified that he was in the area approximately one (1) month after the incident when he saw the Defendant and a female parked on the street near the scene of the incident.  The Defendant asked Mr. Dixon whether he had been present at the time of the incident.  Mr. Dixon indicated that he had been present.  The Defendant gave Mr. Dixon the number of an investigator and asked Mr. Dixon to call the investigator.  Mr. Dixon gave a statement to an investigator (Mr. Shabazz) approximately one (1) month after the incident.

           On cross examination, the Assistant District Attorney (ADA), questioned Mr. Dixon regarding his date of birth and whether he had ever lived at a certain address in Norristown, Pennsylvania.  Mr. Dixon denied ever having been in Norristown.  The ADA then marked the criminal history of Mr. Dixon which had the date of birth he had given and an address in Norristown and showed it to Mr. Dixon without saying what it was.  Mr. Dixon denied that it was his "criminal record".  On redirect examination, in response to defense counsel questioning, Mr. Dixon claimed that he had never been arrested.  Mr. Dixon was instructed by the court to remain outside the courtroom.  He left without being excused.  The ADA produced an arrest photo of Mr. Dixon which matched the FBI extract for Mr. Dixon at the address in Norristown.  Defense counsel stipulated that Mr. Dixon had been arrested before.

PCRA Opinion, June 25, 2010, at 5-6;

       (aaaaa)The PCRA court found that after Dixon denied having lived in Norristown and the prosecutor showed him a copy of his arrest record with that address, without saying what it was, Dixon "sua sponte, announced, 'This ain't me.  I don't have no criminal record.  This guy, this is like a record.  This is like a rap sheet'", id. at 7;

       (bbbbb)   The court noted that on re-direct examination, defense counsel gave Dixon the opportunity to correct any misstatement, which Dixon declined;

(ccccc)     When the prosecutor then asked to publish Dixon's arrest record to the jury to show that he had lied under oath about where he had lived, Wright's counsel stipulated to the fact that Dixon had been arrested, thereby preventing the jury from seeing that Dixon had a burglary conviction as well as six other arrests, id. at 8 n.6;

(ddddd)     The PCRA court found that "[d]efense counsel was well aware of Mr. Dixon's arrest record", id. at 7, and that this was "the least harmful way to correct a problem the witness himself created.  The witness himself placed trial counsel in the position of having to first ask the question complained of and secondly having to stipulate to minimize the damage", id. at 8;

(eeeee)  The PCRA judge thus concluded that "counsel was not ineffective and in fact did his best to salvage the credibility of this witness", id.;

(fffff)   That conclusion is entirely consistent with Strickland's requirement that in evaluating deficiency of trial counsel's performance, courts employ a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance", Strickland, 466 U.S. at 688-89;

(ggggg)     The PCRA court's finding with regard to the ineffectiveness claim was thus neither contrary to nor an unreasonable application of clearly established federal law, and we will not disturb that finding;

(hhhhh)     The Commonwealth takes the position that the ineffectiveness claim Wright raises here is the same as the ineffectiveness claim he raised in the PCRA proceedings, so

"Wright's allegations must be reviewed under the second-order AEDPA standards" and not according to our own <u>Strickland</u> analysis[2], Comm. Resp. at 38;

      (iiiii)   In his objections, Wright objects to "the Magistrate's finding that Appellant's claim that he was denied his constitutional right to effective assistance of counsel when counsel failed to adequately investigate the arrest record of defense witness James Dixon and stipulate *before* calling him to testify", <u>id.</u> (emphasis in original);

      (jjjjj)   Wright thus seems to suggest that this claim -- ineffectiveness for failure to investigate -- differs from his PCRA claim, which was that counsel was ineffective in his in-court response to the evidence of Dixon's criminal history;

      (kkkkk)   If the theory for ineffectiveness of trial counsel Wright presents here differs from the theory he presented in state court, then this claim differs from the claim presented in state court, <u>see, e.g.</u>, <u>McCandless v. Vaughn</u>, 172 F.3d 255, 261 (3d Cir. 1999) ("To 'fairly present' a claim, a petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted"); <u>Evans v. Court of Common Pleas</u>, 959 F.2d 1227, 1231 (3d Cir. 1992) ("Both the legal theory and the facts underpinning the federal claim must have been presented to the state courts, and the same method of legal analysis must be available to the state court as will be employed in the federal court") (internal citations omitted);

---

[2] In the R&R, Judge Caracappa conducted an independent <u>Strickland</u> analysis and found that Wright had "failed to prove that trial counsel's actions fell below an objective standard of reasonableness and that no competent lawyer could have acted in that manner", R&R at 17.

(lllll)   If this claim was not exhausted in state court, the Commonwealth may have waived the exhaustion requirement, because it does not assert it in its response to Wright's claim, see, e.g., Resp. at 33-39;

(mmmmm)   Even if this were so, our own Strickland analysis readily confirms that Wright is not entitled to habeas relief premised upon this claim;

(nnnnn)   Wright argues that had counsel conducted the investigation Wright claims he should have conducted and did not, "he would have known to have stipulated to the witness' arrest record rather than subject the witness to cross examination by the prosecution as to it" Pet. Obj. at ¶ 4;

(ooooo)   Had Dixon not brought up the criminal record of his own accord, his criminal history would likely not have come in at all -- counsel's failure to stipulate to the existence of a criminal record before Dixon testified thus in no way falls outside of "the wide range of reasonable professional assistance" that renders it effective under Strickland;

(ppppp)   For the reasons enunciated herein, w0e find that Wright is not entitled habeas corpus relief;

(qqqqq)   Local Appellate Rule 22.2 of the Rules of the United States Court of Appeals for the Third Circuit provides that "at the time a final order denying a habeas petition . . . is issued, the district court judge will make a determination as to whether a certificate of appealability should issue";

(rrrrr)   Such a certificate should issue only if the petitioner demonstrates that "reasonable jurists could debate" whether the petition states a valid claim for the denial of a constitutional right, Slack v. McDaniel, 529 U.S. 473, 484 (2000); and

(sssss)  We do not believe that reasonable jurists could debate the conclusions contained herein, and so we decline to issue a certificate of appealability;

It is hereby ORDERED that:

1.      The conclusions of Judge Caracappa's report and recommendation (docket entry # 19) are APPROVED AND ADOPTED;

2.      Wright's objections (docket entry # 21) are OVERRULED;

3.      Wright's petition for habeas corpus (docket entry # 1) is DENIED;

4.      For the reasons stated above, we DECLINE to issue a certificate of appealability; and

5.      The Clerk of Court shall CLOSE this case statistically.

BY THE COURT:

/s/ Stewart Dalzell, J.

27